UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMAR TOMA,

    Plaintiff,                                  Civil Action No. 17-CV-13179

vs.                                                   HON. BERNARD A. FRIEDMAN

THE HUNTINGTON
NATIONAL BANK,

    Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        This matter is presently before the Court on defendant's motion for summary judgment [docket entry 16]. Plaintiff has filed a response in opposition, and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide the motion without a hearing.

*Background*

        This is a diversity action involving a dispute over a bank's alleged promise to lend. In the summer of 2014, plaintiff approached defendant about obtaining a Small Business Administration ("SBA") loan to buy out his business partner, Sarmad Shayota ("Shayota"), in an auction. Am. Compl. ¶¶ 2, 18; Pl.'s Aff. ¶ 7; Kroge Dep. at 10-12. Plaintiff and Shayota had worked together since February 2007, when they created PCS Experts, Inc. ("PCS"), a parent corporation of several subsidiaries that sold cell phones, cell-phone plans, and cell-phone accessories. Am. Compl. ¶¶ 9, 11; Pl.'s Aff. ¶ 3. Though their business prospered, by March 2012 their relationship had soured, and they eventually became involved in litigation. Am. Compl. ¶¶ 12, 16; Pl.'s Aff. ¶¶ 3, 5. In 2014, they agreed to resolve their litigation by participating in a two-

person auction – whichever of them bid the highest would acquire the other's interest in PCS. Am. Compl. ¶¶ 13-17; Pl.'s Aff. ¶ 6.

Plaintiff states that during his initial conversations with Ryan Kroge ("Kroge"), defendant's vice president and SBA specialist, he told Kroge about the litigation and that he needed a loan to purchase Shayota's interest in PCS at the auction. Am. Compl. ¶¶ 3, 19; Pl.'s Aff. ¶¶ 8, 21. Plaintiff also expressed concern about the confidentiality of his loan application; he did not want Shayota, who was also defendant's customer, to learn of plaintiff's application and use that information to his advantage – and plaintiff's disadvantage – in the litigation or at the auction. Am. Compl. ¶ 20; Pl.'s Aff. ¶ 8. Plaintiff claims that in response, Kroge reassured him that the existence and contents of his loan application would be kept confidential "consistent with Defendant's policies and procedures pertaining to the handling of loan applications." Am. Compl. ¶ 21; Pl.'s Aff. ¶ 9. In addition, Kroge "informed [plaintiff] that once his loan application was approved, [defendant] could not accept [an] application from Shayota as doing so would (i) create a conflict given the adverse and contentious litigation and (ii) violate Defendant's policies and procedure[s]." Am. Compl. ¶ 22; Pl.'s Aff. ¶ 9.

On August 14, 2014, "[r]elying on Kroge's representations that Defendant would abide by its own policies and procedures," plaintiff applied for a $5,000,000 loan. Am. Compl. ¶ 24; Pl.'s Aff. ¶ 10. Defendant asked plaintiff to produce extensive accounting and business documentation about PCS and its subsidiaries, which he did. Am. Compl. ¶¶ 25-29; Pl.'s Aff. ¶ 11; Kroge Dep. at 20. On November 7, 2014, Kroge sent plaintiff a signed commitment letter for the loan, and plaintiff took the steps necessary to effectuate it. Am. Compl. ¶¶ 32-34; Pl.'s Aff. ¶¶ 12-13; Kroge Dep. at 28. The commitment letter informed plaintiff that defendant

is prepared to provide a first mortgage loan (the "Loan") subject to the terms, conditions and limitations set forth in this letter ("Commitment Letter") with the following basic terms (the "Basic Terms"):

| | |
|---|---|
| Co-Borrowers: | PCS Experts Inc., Amar Toma, Rayco Accessories Inc., PCS Experts of Wyandotte, Inc., PCS Experts of Marysville Inc., Eight Mile and Gratiot Wireless, Inc., PCS Experts of Winter Gardens, Inc., Nine Mile and Harper Wireless, Inc., PCS Experts of Taylor, Inc., 12 & Mound Wireless Inc., PCS Experts of White Lake, Inc., PCS Experts of Shelby NC, Inc., Holland Sylvania Wireless Inc., PCS Experts of Statesville, Inc., PCS Experts of Sebring Inc., PCS Experts of Shelby, Inc., PCS Experts of Sanford, Inc., PCS Experts of Rochester Hills, Inc., Lincoln Park Wireless, Inc., PCS Experts of Richmond, Inc., PCS Experts of Plymouth, Inc., PCS Experts of Pineville, Inc., M59 & Gratiot Wireless, Inc., PCS Experts of Perrysburg, Inc., PCS Experts of Oswego, Inc., M59 & Rochester Wireless, Inc., PCS Experts of Orlando, Inc., PCS Experts of Orlando #2, Inc., Maple & Crooks Wireless Inc., PCS Experts of Okeechobee, Inc., PCS Experts of Mooresville, Inc., PCS Experts of Melbourne, Inc., PCS Experts of Longwood, Inc., Market Street Wireless Inc., Meridian Wireless, Inc., North Lake Wireless Inc., NPCS, Inc., OPCS Inc., PCS Experts of Belleville, Inc., PCS Experts of Bloomingdale, Inc., PCS Experts of Charlotte #2, Inc., PCS Experts of Dixie, Inc., PCS Experts of Kendel, Inc. and Eleven & Hoover, Inc. – Co-Borrowers |
| Purpose of Loan: | To purchase business. |
| Business Location: | 865 Stephenson Hwy[.], Troy, MI 48083 |
| Loan Amount: | Five Million Dollars and No Cents ($5,000,000.00) |

\*\*\*

| | |
|---|---|
| Security: | *A best lien position (behind HNB) on all business assets* of PCS Experts, Inc. *a first lien position on all business assets of* Rayco Accessories Inc., PCS Experts of Wyandotte, Inc., PCS Experts of Marysville Inc., Eight Mile and Gratiot Wireless, Inc., PCS Experts of Winter Gardens, Inc., Nine Mile |

and Harper Wireless, Inc., PCS Experts of Taylor, Inc., 12 & Mound Wireless Inc., PCS Experts of White Lake, Inc., PCS Experts of Shelby NC, Inc., Holland Sylvania Wireless Inc., PCS Experts of Statesville, Inc., PCS Experts of Sebring Inc., PCS Experts of Shelby, Inc., PCS Experts of Sanford, Inc., PCS Experts of Rochester Hills, Inc., Lincoln Park Wireless, Inc., PCS Experts of Richmond, Inc., PCS Experts of Plymouth, Inc., PCS Experts of Pineville, Inc., M59 & Gratiot Wireless, Inc., PCS Experts of Perrysburg, Inc., PCS Experts of Oswego, Inc., M59 & Rochester Wireless, Inc., PCS Experts of Orlando, Inc., PCS Experts of Orlando #2, Inc., Maple & Crooks Wireless Inc., PCS Experts of Okeechobee, Inc., PCS Experts of Mooresville, Inc., PCS Experts of Melbourne, Inc., PCS Experts of Longwood, Inc., Market Street Wireless Inc., Meridian Wireless, Inc., North Lake Wireless Inc., NPCS, Inc., OPCS Inc., PCS Experts of Belleville, Inc., PCS Experts of Bloomingdale, Inc., PCS Experts of Charlotte #2, Inc., PCS Experts of Dixie, Inc., PCS Experts of Kendel, Inc. and Eleven & Hoover, Inc. – Co-Borrowers

*** 

Adverse Change: No material adverse change occurs with respect to the business, operations, condition (financial or otherwise), or prospects, of Borrower, any guarantor, any collateral, or with respect to any other assets of Borrower or any guarantor.

Financial Statements: Borrower agrees to provide updated business and/or personal financial statements no older than 90 days (if applicable) within one full business week of closing or disbursement.

Other Special Conditions:

***

Receipt & Review of Final & Executed Purchase Agreement:
Maximum purchase price of [$]6,500,000 for buyout of Sarmad Shayota. Purchase

agreement should include all entities in which Shayota is selling his shares. Also note that there are 7 other locations with that [sic] have other owners that will also be transferring to Amar Toma. The locations and how they are transferring also must be clarified.

***

The following 7 entities have other owners that must transfer ownership to Amar Toma: PCS of Taylor, Inc., Nine Mile & Harper Wireless, Inc., Maple & Crooks Wireless, Inc., M59 & Gratiot Wireless, Inc., M59 & Rochester Wireless, Inc., 12 & Mound Wireless, Inc., and Eight Mile & Gratiot Wireless, Inc.

***

Additional Terms and Conditions: The proposed credit facilities shall be made pursuant to, and evidenced and secured by, a loan agreement, one or more promissory notes, contracts of guaranty, assignments of insurance, security agreements, mortgages, financing statements, subordination agreements, and such other agreements, instruments and documents as Bank and its counsel may require in their sole and absolute discretion (collectively, the "Loan Documents"). . . . The terms, covenants and conditions set forth herein are intended to be an outline of some of the principal provisions of the Loan Documents rather than a full and complete description or exclusive list of all terms, covenants and conditions to be contained therein.

Bank will require additional documents and information from Borrower, including but not limited to, organizational documents, proof of insurance for the collateral and title insurance with a comprehensive endorsement, a survey if the loan is secured by real estate, all as provided in Bank's current policy requirements. Bank's commitment to lend funds as specified in this letter is conditioned upon Bank's receipt, within fifteen (15) days prior to closing of the Loan, of all requested documents and

> information which must be in form, content and detail satisfactory to Bank. . . .

*Id.* Ex. B. at 1-5, 7 (emphasis in original and alterations added); Kroge Dep. at 27.

In late November 2014, plaintiff learned from Kroge that defendant had received an application from Shayota for a loan to buy out plaintiff's interest in PCS. Am. Compl. ¶ 79; Pl.'s Aff. ¶ 15; Kroge Dep. at 42. Plaintiff states that "Kroge assured me that Shayota's loan application would not be processed by [defendant]." Pl.'s Aff. ¶ 15.

Defendant continued to request from plaintiff additional information necessary to consummate the loan, and plaintiff complied. Am. Compl. ¶¶ 35-37, 40. In January 2015, defendant informed plaintiff of multiple "outstanding issues [defendant] was now requiring as a precondition to closing the Loan" and that had to be addressed before the auction, which was then set to take place on March 30, 2015. *Id.* ¶¶ 41-42, 55, 60-61. Among other things, defendant indicated that it needed consolidated and/or revised financial statements to update its business valuation of PCS because eight of PCS's subsidiaries had been sold and were no longer part of PCS's business operations. *Id.* ¶¶ 60-61; Pl.'s Aff. ¶ 19. Plaintiff resolved the outstanding issues and provided defendant with the documents it sought. Am. Compl. ¶¶ 40, 58-59, 62-63; Pl.'s Aff. ¶ 16; Kroge Dep. at 29, 32, 82, 84.

On January 28, 2015, Mark Morrison ("Morrison"), plaintiff's friend and an "experienced commercial loan officer for another bank," emailed Kroge a copy of a state court order outlining the auction's terms. Am. Compl. ¶¶ 38, 66 and Ex. L; Kroge Dep. at 85. On January 30, 2015, Morrison informed Kroge that the auction had been rescheduled to February 11, 2015. Am. Compl. ¶ 67; Pl.'s Aff. ¶ 21; Kroge Dep. at 52, 85. Given the new auction date, Morrison asked Kroge for "an updated commitment letter before February 11." Am. Compl. ¶ 68; Kroge Dep. at 52. On February 2, 2015, Kroge told plaintiff and Morrison via email that "[t]he

updated business valuation is currently in progress . . . and should be done this week. Once we get the final purchase agreement (or some legal documentation spelling out the transaction and dollar amount) we can go to underwriting and request an updated commitment letter." Am. Compl. ¶ 69 and Ex. M; Pl.'s Aff. ¶ 21; Kroge Dep. at 85. However, defendant never sent plaintiff an updated commitment letter. Am. Compl. ¶¶ 69-70; Pl.'s Aff. ¶¶ 21-22; Kroge Dep. at 53.

On February 10, 2015, Kroge sent plaintiff a letter indicating that defendant was withdrawing its commitment to lend him $5,000,000. Am. Compl. ¶ 70; Pl.'s Aff. ¶ 22; Kroge Dep. at 86-87. Kroge wrote:

> This letter is to inform you that due to the continuing dispute between you and Mr. Shayota which, previously unknown to [defendant], is currently the subject of litigation, as well as your inability to obtain an executed purchase agreement for the purchase of PCS Experts Inc. and its affiliates (the "Companies"), [defendant] is withdrawing its commitment issued to you on November 7, 2014.
>
> I am truly sorry that we are not able to help you at this time. Should you and Mr. Shayota reach a final agreement for your purchase of the Companies, please feel free to contact me and we can re-start the application process.

Am. Compl. Ex. N. In response to plaintiff's questions about defendant's withdrawal, Kroge provided the following additional explanation to plaintiff via email later that day:

> [W]e cannot be a part of a sale where the actual sale can revert to the other party, because [defendant] is not able to close within a certain time frame. Basically, [defendant] cannot have an impact on the ownership of the company, which is currently what this settlement statement allows.

*Id.* ¶ 72 and Ex. O.

Kroge later told plaintiff that "the reasons [defendant] cited for not consummating the Loan were false." *Id.* ¶ 77; Kroge Dep. at 87. Kroge also told plaintiff that defendant had processed both plaintiff's and Shayota's applications at the same time. Am. Compl. ¶¶ 78-79; Kroge Dep. at 42, 46. Further, Kroge stated that defendant's employees who were working on

7

Shayota's application "improperly accessed sensitive and confidential information pertaining to [plaintiff's] application" and used it when handling Shayota's application. Am. Compl. ¶ 80; Kroge Dep. at 67-71. Kroge told plaintiff that he objected to the processing of Shayota's loan application on multiple occasions; he believed doing so was unethical, was a conflict of interest, and violated defendant's policy, given that plaintiff and Shayota were adverse parties in a "hostile situation" with competing loan applications for the same transaction. Am. Compl. ¶¶ 81-87; Kroge Dep. at 42-45. Kroge confirmed with defendant's SBA head operations manager Maggie Ference ("Ference") that defendant did have a policy against taking applications from "dueling parties." Kroge Dep. at 45.

On February 11, 2015, plaintiff participated in the auction. Am. Compl. ¶ 73. He bid up to $7,550,000, but he was outbid by Shayota, who bid $7,600,000. *Id.* ¶ 75; Kroge Dep. at 79; Def.'s Ex. 10 at 18-20. Plaintiff claims that "[a]s a result of [defendant's] decision to withdraw the Loan Commitment, [he] was unable to bid at the auction and protect the value of his interest in PCS." Am. Compl. ¶ 74; Pl.'s Aff. ¶ 24. He also claims that due to defendant's conduct, "[he] lost an annual salary as an officer of PCS exceeding $252,000." Pl.'s Aff. ¶ 24.

In Counts I and II of the amended complaint, plaintiff asserts claims for breach of contract. Am. Compl. ¶¶ 92-107. In Count III, plaintiff claims tortious interference with business expectancy. *Id.* ¶¶ 108-18. In Count IV, plaintiff asserts a claim for fraudulent inducement/misrepresentation, *id.* ¶¶ 119-25, and in Count V, he asserts an innocent misrepresentation claim. *Id.* ¶¶ 126-130. For relief, plaintiff seeks a declaratory judgment as to Count I and damages on Counts II-V.

Defendant moves for summary judgment. It argues that plaintiff's breach of contract claims fail because the terms of the sale of plaintiff's shares conflicted with the terms of

the commitment letter. In addition, it argues that plaintiff's remaining claims are barred by the statute of frauds. Having reviewed the parties' briefs and the applicable law, the Court grants defendant's motion for summary judgment.

*Summary Judgment Standard*

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See id.* at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

*Discussion*

    **A. Counts I and II – Breach of Contract**

Plaintiff argues that the commitment letter was "a binding and enforceable contract" that defendant breached by (1) not executing the loan and (2) "falsely claiming that [plaintiff] had failed to inform [defendant] of the litigation and would not secure a final purchase

9

agreement from Shayota, among other things." Am. Compl. ¶¶ 105-06. Plaintiff asserts that he cooperated with defendant and worked to meet its demands in good faith, but defendant "wrongfully reneged on its promise to consummate the Loan." *Id.* ¶ 101. In Count I, plaintiff seeks a declaration that the commitment letter was a binding and enforceable contract whose written terms defendant breached "when it reneged on its written promise to fund the Loan." *Id.* at 19. In Count II, plaintiff seeks damages. *Id.* at 20.

Defendant argues that even if the commitment letter was binding,[1] plaintiff's breach of contract claims fail because the Court must enforce the commitment letter as written, and the terms of the sale of plaintiff's shares conflicted with the terms of the letter in at least two ways. First, because of Shayota's winning bid of $7,600,000, plaintiff would have had to bid above the commitment letter's maximum purchase price of $6,500,000 to win the auction. Def.'s Br. at 16-17; Am. Compl. Ex. B. at 5. Second, after the commitment letter was signed, certain PCS stores that were listed as co-borrowers and for purposes of providing security were sold and were therefore no longer part of the property being auctioned.[2] Def.'s Br. at 17-18. Defendant argues

---

[1] Defendant disputes that the commitment letter is binding "because, among other reasons, material and essential terms remained unresolved and there were numerous conditions precedent." Def.'s Br. at 1 n.1. But defendant states that for purposes of this motion, it "assumes that the commitment letter was binding." *Id.*

[2] As to the reduced co-borrowers, defendant states that not only did this affect PCS's valuation, but plaintiff himself "acknowledged that [it] changed the terms of the transaction and required issuance of an updated commitment letter." Def.'s Br. at 18. Defendant asserts that it never issued a revised commitment letter, which means that it never issued a written commitment "stating an obligation to lend $5,000,000 with reduced co-borrowers or with liens from less than all the PCS Affiliates identified in the commitment letter." *Id.* Plaintiff appears to acknowledge that defendant never issued an updated commitment letter.

10

that these two occurrences were at odds with the terms of the commitment letter and that therefore defendant was released from its obligation to lend.³ *Id.* at 16-18.

Under Michigan law, contract interpretation is governed by the parties' intentions, which are ascertained by "look[ing] first to the language in the written agreement." *Lotsadough, Inc. v. Comerica Bank*, No. 12-10121, 2012 WL 5258300, at *5 (E.D. Mich. Oct. 23, 2012) (internal citations omitted). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Id.* (quoting *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 166 (1996)); *see also Helmus v. Chase Home Fin., LLC*, 890 F. Supp. 2d 806, 814 (W.D. Mich. 2012) ("If the language of a contract is clear and unambiguous, the court should construe it according to its plain sense meaning."). As a result, "[a] court must enforce a contract as written if there is only one possible interpretation." *Fawaz v. Bus. Loan Express, LLC*, No. 05-73135, 2006 WL 1779411, at *5 (E.D. Mich. June 26, 2006) (citing *Morley v. Auto. Club of Mich.*, 458 Mich. 459, 465 (1998)). The terms of the agreement lay out the rights and duties of the parties to a contract. *Id.* (citing *Evans v. Norris*, 6 Mich. 369, 372 (1859)).

Michigan law defines a condition precedent in a contract as "a condition that must be met by one party before the other party is obligated to perform." *Fawaz*, 2006 WL 1779411,

---

³ Defendant also argues that the statute of frauds does not allow plaintiff to assert any waiver or modification to the commitment letter with respect to the maximum purchase price and the reduced co-borrowers. Def.'s Br. at 17-18. The statute of frauds prohibits actions against financial institutions to enforce certain promises or commitments that are not in writing and not signed by an authorized agent. *See* Mich. Comp. Laws § 566.132(2). But in his breach of contract claims, plaintiff does not assert that there was any waiver or modification to the commitment letter that was made orally or that was unsigned; rather, his claims are based on defendant's alleged non-compliance with the commitment letter's written terms. As a result, the statute of frauds does not apply to these claims.

at *5 (quoting *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 411 (2002)). It is also defined as

> "a fact or event that the parties intend must take place before there is a right to performance." *Real Estate One v. Heller*, 272 Mich.App. 174, 179, 724 N.W.2d 738, 741 (2006) (quoting *Mikonczyk v. Detroit Newspapers, Inc.*, 238 Mich.App. 347, 605 N.W.2d 360 (1999)). A party that fails to fulfill a condition precedent "loses all right to require the further fulfillment of the contract on the part of the other party." *Wolverine Packing Co. v. Hawley*, 251 Mich. 215, 219, 231 N.W. 617, 618 (1930) (internal quotation omitted).

*Lotsadough, Inc.*, 2012 WL 5258300, at *6.

In the present case, the commitment letter's language is unambiguous. The first line states that defendant "is prepared to provide a first mortgage loan (the 'Loan') subject to the terms, conditions and limitations set forth in this letter ('Commitment Letter') with the following basic terms (the 'Basic Terms')." Am. Compl. Ex. B at 1. The Basic Terms that follow include a list of co-borrowers, security in the form of liens on all of PCS's and the co-borrowers' business assets, and "special conditions" setting the maximum purchase price at $6,500,000 for buying out Shayota and requiring that defendant receive and review a final and executed purchase agreement that "should include all entities in which Shayota is selling his shares" and for which clarification about certain locations with other owners was necessary. *Id.* at 1-3, 5. A Basic Term labeled "Adverse Change" states that no "material adverse change" was to take place regarding the business or operations of the parties or "any collateral." *Id.* at 4. In addition, the last page of the commitment letter references the "terms, covenants and conditions set forth herein" and makes clear that defendant's "commitment to lend funds as specified in this letter is conditioned upon [defendant's] receipt, within fifteen (15) days prior to closing of the Loan, of all requested documents and information which must be in form, content and detail satisfactory to Bank." *Id.* at 7.

The plain and ordinary meaning of the commitment letter's terms referenced above, and the only way to interpret them, is that they are conditions precedent to be met by plaintiff before defendant had an obligation to perform. Given that these conditions were not met, defendant had no duty to lend plaintiff money under this instrument. Moreover, plaintiff has not shown how defendant "falsely claiming" that he failed to inform it of the litigation breached the written terms of the commitment letter. Thus, even viewing the evidence in a light most favorable to plaintiff, a jury could not find in his favor because the commitment letter clearly set forth conditions precedent that were unmet. Defendant is therefore entitled to summary judgment on Counts I and II.

### B. Count III – Tortious Interference with Business Expectancy

Plaintiff also asserts a claim of tortious interference with business expectancy. Defendant argues that this claim is barred by the statute of frauds.

In Michigan, "a tortious interference claim requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship; and (4) resulting damage to the plaintiff." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (internal quotation omitted).

Plaintiff states that he had a valid business expectancy "in the auction agreement" between him and Shayota and that defendant was aware of this agreement. Am. Compl. ¶¶ 109, 112. Plaintiff claims that defendant "knew that its refusal to provide financing on the eve of the auction would interfere with [plaintiff's] ability to fully participate under [the] auction agreement and outbid Shayota." *Id.* ¶ 113. Plaintiff also claims that by working to provide financing to Shayota and "wrongfully refusing to provide funding to [plaintiff] for contrived reasons,"

13

defendant "all but guaranteed that Shayota would be the winning bidder." *Id.* ¶ 116. Plaintiff asserts that even though he was compensated for his interest in PCS, he was harmed by defendant's conduct because he lost additional revenues he would have earned as the sole owner of PCS. *Id.* ¶ 117.

Defendant argues that plaintiff's claim is barred by the statute of frauds because it "depend[s] on an alleged obligation of [defendant] to lend $5,000,000 under the terms of the commitment letter." Def.'s Br. at 20. But

> [a] claim for tortious interference with a contract or business relationship is a tort claim, not a contract claim; it does not depend on the existence of an enforceable contract. *Northern Plumbing & Heating, Inc. v. Henderson Bros.*, Inc., 268 N.W.2d 296, 298 (Mich. Ct. App. 1978); *accord Rosati Masonry Co., Inc. v. Great Am. Ins. Companies*, No. 196171, 1997 WL 33344940, at *1 (Mich. Ct. App. Aug. 26, 1997). Consequently, "[t]he statute of frauds is not a bar to this type of action." *Northern Plumbing*, 268 N.W.2d at 298.

*Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2016 WL 286072, at *2 (W.D. Mich. Jan. 25, 2016). Thus, the statute of frauds does not bar plaintiff's tortious interference claim.

However, plaintiff's claim fails because the business expectancy in this case was too indefinite. To satisfy the first element of a claim of tortious interference with business expectancy – i.e., demonstrate the existence of a valid business relationship or expectancy – a plaintiff "must show that [he] had more than a 'subjective expectation of entering into a [business] relationship.'" *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 789-90 (E.D. Mich. 2013) (quoting *Compuware Corp. v. IBM*, 259 F. Supp. 2d 597, 604 (E.D. Mich. 2002)), *aff'd*, 770 F.3d 436 (6th Cir. 2014). "To establish a valid expectancy a plaintiff must objectively establish that the expectancy is reasonably or probably likely to occur." *BullsEye Telecom, Inc. v. BroadSoft, Inc.*, No. 18-CV-10195-VAR-RSW, 2018 WL 3631586, at *4 (E.D. Mich. July 31, 2018) (internal

14

citations omitted). "[M]ere wishful thinking" as to the expectancy of a business relationship is not enough. *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 967 (E.D. Mich. 2017).

In the present case, plaintiff could not have reasonably expected to win the auction. Nor was there a likely probability that he would win. The outcome of an auction is impossible to predict. It depends on what others bid,[4] and therefore plaintiff's expectation of winning was at best "mere wishful thinking." Plaintiff had "nothing more" than a "'unilateral hope' of winning" the auction. *See EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 353 (6th Cir. 2008) (quoting *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992)). Because plaintiff had no valid business expectancy, defendant is entitled to summary judgement on Count III.

### C. Counts IV and V – Fraudulent Inducement/Misrepresentation and Innocent Misrepresentation

Finally, plaintiff asserts that defendant committed fraudulent inducement/misrepresentation and innocent misrepresentation in making statements to him regarding (1) its policies and procedures for handling a loan applicant's sensitive and confidential information and (2) its reasons for refusing to provide financing to plaintiff. Am. Compl. ¶ 120. Plaintiff identifies these statements by defendant as follows:

> (a) stating it would keep [plaintiff's] loan application information secret even from employees not assigned to the review of [plaintiff's] loan application and therefore having no need to access or see it;

---

[4] As to the bidding process in another context, "Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract." *EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 352 (6th Cir. 2008) (citing *Timmons v. Bone*, No. 228942, 2002 WL 745089, at *2 (Mich. Ct. App. Apr. 23, 2002)); *see also Midwest Auto Auction, Inc. v. McNeal*, No. 11-14562, 2012 WL 3478647, at *15 (E.D. Mich. Aug. 14, 2012). The Sixth Circuit "agree[s], and note[s] that holding otherwise would give any low responsive bidder an immediate business expectancy in the government contract at issue." *Id.* at 353. Although the instant case involves a different kind of bidding process, plaintiff is similarly a "disappointed bidder" with no valid business expectancy.

15

    (b) stating that it would not disclose or use [plaintiff's] loan application information in connection [with] an application from Shayota, if one was received; and

    (c) stating that it could not provide funding to [plaintiff] for the auction because the "sale [could] revert to the other party" when in fact Defendant was moving forward with providing financing to Shayota at the same time.

*Id.* According to the amended complaint, Kroge communicated statements (a) and (b) orally to plaintiff, whereas statement (c) was contained in an email Kroge sent to plaintiff. Defendant does not dispute that these statements were made.

    Defendant moves for summary judgment on plaintiff's fraud and misrepresentation claims on the basis that they are precluded by the statute of frauds. But the statute of frauds only relates to Kroge's oral promises, i.e., statements (a) and (b). It does not relate to Kroge's email, i.e., statement (c).

    a. <u>Kroge's Oral Promises</u>

    The statute of frauds bars plaintiff's claims of fraud and misrepresentation as to Kroge's oral promises. The Michigan statute of frauds provides:

> (2) An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
> (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.
>
> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.
>
> (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

16

Mich. Comp. Laws § 566.132(2). "This statutory provision has been strictly enforced to bar any type of claim against a financial institution that is not supported by a written document signed by an authorized agent of the financial institution." *Ferris v. Bank of Am. Corp.*, No. 11-CV-13104, 2013 WL 3497924, at *5 (E.D. Mich. July 11, 2013) (internal citation omitted). Indeed,

> [t]he Michigan statute of frauds precludes a party from "bringing a claim— no matter its label—against a financial institution to enforce the terms of an oral promise," *Crown Tech.*, 619 N.W.2d at 72; *see also Jarbo*, 2010 WL 5173825, at *11 ("Michigan's statute of frauds similarly precludes Plaintiffs from bringing negligent or innocent misrepresentation claims against Defendants because these claims seek to enforce oral promises."); *Muneio v. Fed. Nat'l Mortg. Ass'n*, No. 09–12973, 2010 WL 5146328, at *3 (E.D.Mich. Dec.13, 2010) (Cohn, J.) (holding that the statute of frauds bar extended to the plaintiff's misrepresentation claims against the defendant financial institution); *Ellison v. Wells Fargo Home Mortg., Inc.*, No. 09–CV–14175, 2010 WL 3998091, at * (E.D.Mich. Oct.12, 2010) (Murphy, J.) (holding that the Statute of Frauds barred the borrower's fraud claim regarding an alleged oral accommodation); *Manire v. Am. Equity Mortg., Inc.*, No. 04–60278, 2005 WL 2173679, at *3 (E.D.Mich. Sept. 6, 2005) (Battani, J.) (holding that the Michigan Statute of Frauds prevented the plaintiff from asserting claims of intentional and negligent misrepresentation that were based on oral statements); *Republic Bank v. Britton Estates, L.L.C.*, No. 258616, 2006 WL 445916, at *4 (Mich.Ct.App. Feb.23, 2006) (affirming summary judgment in favor of the bank because the statute of frauds barred the appellants' misrepresentation claims).

*Brown v. Bank of N.Y. Mellon*, No. 1:10-CV-550, 2011 WL 6016901, at *4 (W.D. Mich. Dec. 2, 2011). Therefore, to the extent that plaintiff's claims are based on Kroge's oral promises, they are barred by the statute of frauds.

In his response, plaintiff argues that summary judgment should be denied because defendant's conduct raises questions of fact as to whether defendant is equitably estopped from asserting the statute of frauds as a defense.

Under Michigan law, "[e]quitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact." *Lakeside Oakland Dev., L.C. v. H & J Beef Co.*, 249

Mich. App. 517, 527 (2002). "Equitable estoppel arises where one party has knowingly concealed or falsely represented a material fact, while inducing another's reasonable reliance on that misapprehension, under circumstances where the relying party would suffer prejudice if the representing or concealing party were subsequently to assume a contrary position." *Ferris*, 2013 WL 3497924, at *6 (quoting *Adams v. City of Detroit*, 232 Mich. App. 701, 708 (1998)). "[T]he defense [of equitable estoppel] cannot be used to avoid the statute of frauds where the alleged misrepresentation relates to a future promise rather than a past or existing fact." *W. Creative, Inc. v. SCI Funeral & Cemetery Purchasing Co-op., Inc.*, No. 12-11486, 2014 WL 6986170, at *11 (E.D. Mich. Dec. 10, 2014) (citing *Cuddihy v. Wayne State Univ. Bd. of Governors*, 163 Mich. App. 153, 156-57 (1987), and *Wier v. Countrywide Bank, N.A.*, No. 10-11468, 2011 WL 1256944, at *5 (E.D. Mich. Mar. 31, 2011)).

In this case, plaintiff has not shown that Kroge "knowingly concealed or falsely represented a material fact." There is no indication that Kroge, at the time the oral promises were made, misrepresented that plaintiff's loan application information would be kept confidential. On this record, there is no question of fact regarding Kroge's actions. Kroge testified that based on his fourteen years of experience as an SBA lender, he believed that defendant had a policy against accepting both plaintiff's and Shayota's loan applications because they were adverse parties, there was a hostile situation between them, and the applications concerned the same transaction. Kroge Dep. at 43-44. Kroge also believed that processing both applications simultaneously was unethical and a conflict of interest. *Id.* at 42-45. Kroge objected to defendant processing Shayota's loan application and confirmed with Ference that defendant did, in fact, have a policy against taking both applications. Am. Compl. ¶¶ 81, 83, 85, 87; Kroge Dep. at 45. These undisputed facts indicate that Kroge did not make misrepresentations to plaintiff about the handling of his loan

18

application information because at the time of their conversation Kroge believed that, for various reasons, defendant would not process a loan application from Shayota. Moreover, because Kroge's promises relate to the future, they "cannot be used to avoid the statute of frauds." *W. Creative, Inc.*, 2014 WL 6986170, at *11. As a result, defendant is entitled to summary judgment on plaintiff's claims of fraud and misrepresentation as to Kroge's oral promises.

      b. <u>Kroge's Email</u>

Plaintiff's fraud and misrepresentation claims as to Kroge's email are untouched by the statute of frauds, but they nonetheless fail for a different reason. "In order to state a claim for fraud or misrepresentation, plaintiff must prove: (1) that defendant made a material representation; (2) that the representation was false; (3) when defendant made the representation, defendant knew it was false, or made it recklessly without knowledge of its truth or falsity; (4) that defendant made it with the intent that plaintiff would act upon it; (5) that plaintiff acted in reliance upon it; and (6) that plaintiff suffered injury." *James v. City of Burton*, 221 Mich. App. 130, 134-35 (1997). Claims for fraud and misrepresentation "require a showing of some measure of reliance." *Bobbitt v. Acad. of Court Reporting, Inc.*, 252 F.R.D. 327, 341 (E.D. Mich. 2008) (internal citations omitted).

In this case, plaintiff cannot show reliance. No reasonable juror could conclude that when plaintiff participated in the auction and submitted a bid of $7,550,000 he was acting in reliance on Kroge's email. That email simply explained why defendant would not be providing plaintiff with financial backing for that transaction. Thus, summary judgment is granted for defendant on plaintiff's claims of fraud and misrepresentation as to Kroge's email.

Accordingly, defendant is entitled to summary judgment on Counts VI and V.

*Conclusion*

For the reasons stated above,

IT IS ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that plaintiff's motion to quash or modify third party subpoenas [docket entry 26] is granted because the case is terminated.

|  |  |
|---|---|
| | s/Bernard A. Friedman |
| Dated: February 14, 2019 | BERNARD A. FRIEDMAN |
| Detroit, Michigan | SENIOR UNITED STATES DISTRICT JUDGE |